SUSAN E. BISHOP, CA STATE BAR NO. 187253
EMILY J. TEWES, CA STATE BAR NO. 318439
BERLINER COHEN, LLP
TEN ALMADEN BOULEVARD
ELEVENTH FLOOR
SAN JOSE, CALIFORNIA 95113-2233
TELEPHONE: (408) 286-5800
FACSIMILE: (408) 998-5388
susan.bishop@berliner.com
emily.tewes@berliner.com

ATTORNEYS FOR DEFENDANTS FIDELITY HOME ENERGY,
INC. AND BRADLEY SMITH

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FIDELITY HOME ENERGY, INC., a California corporation; BRADLEY SMITH, an individual; and DOES 1-49,<br><br>Defendants. | CASE NO.  4:19-CV-01231-JSW<br><br>REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS TO PLAINTIFF-INTERVENOR'S FIRST AMENDED COMPLAINT IN INTERVENTION<br><br>Date:          October 25, 2019<br>Time:          9:00 a.m.<br>Ctrm:          5<br>Judge:        Hon. Jeffrey S. White |

In deciding a Rule 12(b)(6) motion to dismiss the Court will consider pleadings and matters of judicial notice, which may include an earlier state court action that is a matter of public record. (See Watkins v. United States, 854 F. 3d 947, 949-950 (7th Cir. 2017). Thus, pursuant to Federal Rules of Evidence rule 201, Defendants Fidelity Home Energy, Inc. and Bradley Smith respectfully request that the Court take judicial notice of the following:

1.  The state law complaint filed by Plaintiff-Intervenor Ayesha Faiz against Defendant Fidelity Home Energy in the Superior Court of Alameda County on December 4, 2017, attached hereto as **Exhibit A**.

DATED:  AUGUST 27, 2019

BERLINER COHEN, LLP

BY: */s/ Susan E. Bishop*
SUSAN E. BISHOP
ATTORNEYS FOR DEFENDANTS FIDELITY HOME
ENERGY, INC. AND BRADLEY SMITH

-1-

4820-4392-3874v1
SBISHOP\24659004

# EXHIBIT A

FILED BY FAX
ALAMEDA COUNTY

December 04, 2017

CLERK OF
THE SUPERIOR COURT
By Burt Moskaira, Deputy

CASE NUMBER.
RG17884669

1  MORA EMPLOYMENT LAW, APC
   BETH W. MORA, CSB No. 208859
2  E-mail: bmora@moralaw.com
   18 Crow Canyon Court, Suite 145
3  San Ramon, CA  94583
   Telephone: 925.820.8949
4  Facsimile: 925.820.0278

5
   LEGAL AID AT WORK
6  MARISA DIAZ, CSB No. 293072
   E-mail: mdiaz@legalaidatwork.org
7  CHRISTOPHER HO, CSB No. 129845
   E-mail: cho@legalaidatwork.org
8  180 Montgomery Street, Suite 600
9  San Francisco, CA 94104
   Telephone: 415.864.8848
10 Facsimile: 415.593.0096

11 Attorneys for Plaintiff AYESHA FAIZ

12

13

14 IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

15 FOR THE COUNTY OF ALAMEDA

16

|  | |  |
|---|---|---|
| 17  AYESHA FAIZ, | ) | Case No. |
| 18      Plaintiff, | ) ) | **COMPLAINT FOR DAMAGES FOR:** |
| 19  v. | ) ) | 1. Wrongful Constructive Termination in Violation of Public Policy; |
| 20  FIDELITY HOME ENERGY, INC., a California Corporation; and DOES 1-50, | ) ) ) | 2. Wrongful Demotion in Violation of Public Policy; |
| 21 | ) ) | 3. Failure to Pay Earned Wages in Violation of Cal. Labor Code Section 201 et. seq.; |
| 22      Defendants. | ) ) | 4. Retaliation in Violation of Labor Code Section 1102.5; and, |
| 23 | | 5. Negligent Supervision. |
| 24 | | |
| 25 | | **DEMAND FOR JURY TRIAL** |

26

27

28

## COMPLAINT

Now comes AYESHA FAIZ, Plaintiff in this action, and files this Complaint, and further alleges as follows:

### PARTIES TO THE CIVIL ACTION

1. Plaintiff AYESHA FAIZ (hereinafter "Plaintiff") is an adult natural person who is and was at all times mentioned herein a resident of the State of California.

2. Plaintiff is informed and believes and thereon alleges that Defendant FIDELITY HOME ENERGY, INC., a California corporation, was at all times material to this Complaint an employer of the Plaintiff, and that its principal place of business was San Leandro, California. Further, all actions material/relevant to this Complaint occurred within the County of Alameda.

3. Plaintiff is further informed and believes and thereon alleges that Defendants DOES 1-24 are business entities of unknown form who also were the employer(s) of Plaintiff. Their true names and capacities are unknown to Plaintiff, and are therefore herein sued under fictitious names.

4. Plaintiff is further informed and believes and thereon alleges that DOES 25-50 were employees, officers, directors, managing agents, and/or supervisors of Defendants FIDELITY HOME ENERGY, INC. who were acting within the scope and course of their employment and supervisory authority over Plaintiff at all times relevant to this Complaint.

5. Plaintiff is informed and believes and thereon alleges that there existed, at all times relevant to this Complaint, a unity of interests between all Defendants such that any individuality and separateness between them ceased, and said Defendants were the alter ego of each other and exerted control over each other. Adherence to the fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants would permit an abuse of the corporate privilege and

1

Complaint for Damages; Demand for Jury Trial

1  sanction fraud and/or promote injustice. Thus, FIDELITY HOME ENERGY, INC. and DOES 1–50

2  are hereinafter collectively referred to as "Defendant" or "Defendants".

3  <center>**VENUE AND JURISDICTION**</center>

4      6.    Venue is proper because the actions and injuries giving rise to this Complaint took

5  place in the County of Alameda, and because Defendant has its principal place of business in the

6  County of Alameda.

7      7.    Subject matter jurisdiction in this action is properly in this Court, as the action

8  incorporates an amount in controversy which exceeds $25,000.00.

9

10      8.    Plaintiff is informed and believes that Defendant and/or DOES 1-24 are employers

11  subject to suit under applicable California law in that Defendant and DOES 1-24 are doing business

12  with five or more employees in the State of California.

13  <center>**FACTS COMMON TO ALL CAUSES OF ACTION**</center>

14      9.    Plaintiff began her employment at Defendant, a company that sells solar panels and

15  other energy efficient products, on or about November 12, 2015. Plaintiff was hired to work as a

16  Representative Services Supervisor in Defendant's Representative Services Department in San

17  Leandro, California, which was also referred to as the "Confirmer Room". During all relevant times,

18  Bradley Smith was the Owner, President and CEO of Defendant and Melvyn Roberts was the San

19  Leandro Branch Manager and reported to Mr. Smith. As a single mother of two young boys, Plaintiff

20  was thankful and eager to begin work at Defendant.

21

22      10.    During Plaintiff's on-boarding process, the employee assisting Plaintiff with new hire

23  documents several times indicated the employee's belief that Plaintiff was of Hispanic or Latina

24  descent and that Plaintiff spoke Spanish. Plaintiff is of Afghan descent, a practicing Muslim, and does

25  not speak Spanish. At the time, Plaintiff simply clarified that she did not speak Spanish. Darlene

26

27  <center>2</center>
<center>Complaint for Damages; Demand for Jury Trial</center>

28

Mills, a Supervisor at Defendant who knew Plaintiff from prior employment and who had advised Plaintiff of the position at Defendant, was aware of Plaintiff's national origin and religion but did not share this information with employees of Defendant. Plaintiff is informed and believes she was the only employee of Middle Eastern descent and Muslim faith in Defendant's San Leandro office.

11.     Plaintiff was advised she was hired to replace Leata Tufono, a Representative Services Supervisor. Plaintiff's duties for said position consisted primarily of supervising confirming consultation appointments for Defendant's sales staff to visit prospective customers' homes for a solar panel or other type of installation evaluation. Employees in other departments, such as the "Hot Data room," were the first points of customer contact, making and receiving phone calls to develop appointment "leads." Staff in the Confirmer Room then followed up on these leads to confirm appointments with "eligible customers."

12.     Early in Plaintiff's employment, she was advised of and personally observed adherence to a discriminatory policy created by and/or authorized by Defendant of not serving potential customers of perceived Middle Eastern or Indian descent. While being trained by Ms. Tufono, Plaintiff was instructed to tell callers of Middle Eastern or Indian descent that there were no available appointments even when that was not true, and to further tell the caller that Defendant would send information about its services by mail even though it had no intention of sending such information. Though in shock, Plaintiff inquired as to the reason for the policy. Ms. Tufono casually noted she did not know and simply continued training Plaintiff.

13.     To her great dismay Plaintiff also observed Ms. Tufono implementing Defendant's discriminatory policy. During a training exercise, Ms. Tufono showed Plaintiff how to use Google to screen caller names when uncertain if the caller was of Middle Eastern or Indian descent. Plaintiff sat next to Ms. Tufono as the latter reviewed Defendant's database for appointments that were set to be

3

confirmed. Ms. Tufono suddenly turned to Plaintiff, pointed to a name on the list, and indicated that they would not "run" it since it appeared to be a Middle Eastern name. Ms. Tufono then opened her search browser to Google and searched for images of people with that name. Based on these images, Ms. Tufono stated something to the effect of "That is definitely a Middle Eastern, I can't confirm this." Ms. Tufono explained she used this system to cancel appointments for callers with Defendant when her search revealed that callers were perceived to be of Middle Eastern or Indian descent. Further causing Plaintiff significant distress and anxiety, Plaintiff personally observed Ms. Tufono searching for the origin of names that were familiar to hers, including last names shared by members of Plaintiff's own family and community.

14.     As a Representative Services Supervisor, Plaintiff was often asked to step in for the Hot Data room supervisors and supervise the employees directly as they made their calls. During these periods, Plaintiff observed more troubling evidence of Defendant's discriminatory policy. For example, Plaintiff saw a post-it note on an employee's computer that said "**No Indians.**" During this time and throughout her employment, Plaintiff also observed employees insert notes within Defendant's computer system with comments such as "*Not Qualified*" and "*We Won't Run This*" in cases where the employee had refused appointments due to his or her assumption about the callers' national origin. Plaintiff saw yet another computer entry which stated, "*WE WON'T RUN THIS*" while a second note read, "*Indian name !! NO.*" In addition, the database provided a drop-down menu where employees could "flag" files for various reasons. One of the available reasons was "ethnicity." During Plaintiff's employment, she witnessed this "ethnicity" flag used on files of customers with Middle Eastern names numerous times.

15.     On occasion, Plaintiff received requests in her Supervisor role to assist the Hot Data room to confirm a service appointment with perceived Middle Eastern and Indian customers who had

4

inadvertently been provided an appointment. Though causing Plaintiff significant distress, she was forced to abide by Defendant's discriminatory policy. During the second full week of her employment (approximately the week of November 23, 2015) Plaintiff rejected prospective customers of perceived Middle Eastern or Indian descent, stating there were no available appointment times even though she knew that was not the case.

16.    In one instance, Plaintiff was required to call a customer whom she believed was of Indian descent who had received a confirmed appointment by accident to tell him that his appointment with Defendant had to be cancelled due to a scheduling conflict. No such conflict existed.

17.    Plaintiff felt substantial remorse for complying with Defendant's policy, and she experienced difficulty sleeping and focusing as a result. Plaintiff found herself constantly worrying that she would be faced with a confirmation issue for a person of Middle Eastern or Indian descent while at work, dreading each confirmation presented to her.

18.    Deeply distressed by Defendant's policy and her own role in implementing it, Plaintiff questioned several supervisors about its purpose and genesis. For example, during Plaintiff's second full week of work, she asked Thomas Keyes, the AM shift Hot Data Supervisor and a long term employee, why Defendant did not serve Middle Eastern customers. Like Ms. Tufono, Mr. Keyes responded nonchalantly, neither providing a reason for the policy nor acknowledging its discriminatory nature. Still searching for some resolution, Plaintiff then asked the PM shift Hot Data Supervisor, Vivian Yokley, about Defendant's policy. Ms. Yokley also said she did not know the reason for the policy and made no further comment. Plaintiff was alarmed to learn that several managers simply imposed a discriminatory policy without concern for the reason it was in place.

19.    Feeling desperate, Plaintiff then raised her concerns about Defendant's discriminatory policy with Ms. Mills. Plaintiff understood that, pursuant to company policy, she would have to

5

express her concerns to Ms. Mills. as her immediate supervisor, and that Ms. Mills could then raise these concerns up the chain to her supervisor, Scott Johnson-Temores. Mr. Johnson-Temores could then discuss this concern with his supervisor, Melvyn Roberts, the Branch Manager, who would be the individual to bring it to the attention of Defendant's CEO, Mr. Smith.

20.    Ms. Mills advised Plaintiff that Mr. Roberts and Mr. Smith had simply informed staff not to serve Middle Eastern and Indian customers. She also did not know the reason for the policy. Contrary to the others in management, when discussing the matter with Plaintiff, Ms. Mills expressed understanding as to why Plaintiff would find the policy distressing.

21.    Given Ms. Mills' indication that the policy had been imposed by the Branch Manager and CEO. Plaintiff was not certain who she could discuss the policy with, if anyone, thereafter. In addition, other employees, including Ms. Tufono during her training, had specifically advised her that Mr. Smith had a short temper and did not like to be disturbed or to interact with his employees. Plaintiff did not have much opportunity to interact with Mr. Smith as he was often in another location and when she did see him he did not engage with employees often. However, Plaintiff witnessed Mr. Smith speak in a demeaning manner to several employees confirming the warnings she had received. Fearful of retaliation as a single mother supporting two young boys, Plaintiff attempted to make the best of a difficult situation.

22.    Within the same timeframe, Plaintiff also nonetheless began to discuss Defendant's discriminatory policy with the employees in the Hot Data room. In casual conversations, numerous Hot Data room employees questioned the legitimacy of the policy, which they expressed was discriminatory and/or negatively impacted their confirmation numbers. However, they noted they felt they were powerless given that they did not have the ability to formally confirm appointments.

23.     Sometime during the second week of Plaintiff's employment, Plaintiff shared with various coworkers that she was of Middle Eastern descent. The first time occurred when Daryl Smith, a co-worker, approached Plaintiff as she worked alongside Ms. Tufono and Mr. Keyes in the Representative Services Room and asked her to confirm an appointment for a Spanish-speaking customer. Plaintiff informed him that she would not be able to do that since she did not speak Spanish and was not Hispanic. After this encounter, Plaintiff noticed a confused look on Ms. Tufono and Mr. Keyes's faces. She informed them both that she was Middle Eastern and they replied that they believed she was Mexican. Shortly after this incident, Ms. Faiz shared her ethnicity and religion with various other employees and supervisors.

24.     Upon learning of Plaintiff's descent, Plaintiff's co-managers became notably less vocal about Defendant EMPLOYER's policy in the workplace and more cautious about discussing the policy in practice around Plaintiff. Further, Plaintiff began to be excluded from discussions with other managers.

25.     On or around Saturday, November 28, 2015, Mr. Smith, Defendant's owner, President and CEO, entered the workplace and advised employees that they could now accept appointments from persons of Middle Eastern and Indian descent. Plaintiff found Mr. Smith's comments timely as just days prior a female African-American employee had been fired for failing to meet her quota; this employee, in turn, strongly expressed that the workplace was discriminatory and that it was wrong in refusing to work with people of Middle Eastern and Indian descent. Plaintiff was advised that, as part of her departure, this employee made a complaint to Mr. Smith that the policy of refusing service to people of Middle Eastern and Indian descent was discriminatory. To her utter dismay, the employees and supervisors went immediately back to compliance with the discriminatory policy. Plaintiff

Complaint for Damages; Demand for Jury Trial

1    questioned other supervisors about these conflicting actions to no avail, and the policy continued

2    thereafter.

3         26.      On Thursday, December 3, 2015, during a meeting of the entire supervisor team in the

4    San Leandro office, CEO Mr. Smith informed Plaintiff that she was no longer a supervisor in the

5    Representative Services Department, but simply a "confirmer." Plaintiff was utterly humiliated and

6    embarrassed to be demoted in the presence of the entire supervisor staff. Mr. Smith attempted to

7    justify Plaintiff's demotion by claiming that Scott Johnson-Temores (the San Diego office manager

8    who hired Plaintiff) had mistakenly given Plaintiff the impression she would be a supervisor, and that

9    Plaintiff had actually been hired for a confirmer position.

10

11        27.      As a single mother with two young sons to support, Plaintiff was deeply concerned the

12   demotion would negatively impact her compensation, salary and bonus structure. Plaintiff is informed

13   and believes that she suffered a loss of commission as a result of the demotion. Plaintiff also believes

14   that she was not paid a commission for work conducted while in the Supervisor role prior to the

15   demotion and consistent with the "Hot Data/Rep. Services Supervisor Pay Plan" Defendant gave

16   Plaintiff on or about November 20, 2015.

17

18        28.      On Monday, December 5, 2015, feeling extremely exasperated by the ongoing

19   discrimination occurring in the workplace, Plaintiff again inquired of Thomas Keyes what the exact

20   reason for the discriminatory policy was and if it would continue. Mr. Keyes did not provide a

21   rationale for the policy or take any action to attempt to terminate the policy.

22

23        29.      Unable to further withstand the authorized and condoned ongoing discrimination and

24   retaliation, regarding which Defendant had made clear it would not remedy or prevent, and following

25   her wrongful demotion, Plaintiff had no other option but to resign. Plaintiff did not believe she could

26

27                                                 8

28

1   continue to engage in illegal conduct, especially since this conduct was often directed at members of

2   her own national origin group.

3        30.    Plaintiff presented her resignation to Defendant on or around Monday, December 7,

4   2015 in a text message to Ms. Tufono, the supervisor who trained her. Plaintiff's text message

5   unequivocally set forth her objections to and reasons for her forced termination – namely, Defendant's

6   discriminatory policy. Plaintiff stated she had *"been really uncomfortable working there since*

7   *knowing the company refuses to service middle easterners or Indians."* Plaintiff continued, *"[j]ust*

8   *imagine being black for example and going to work somewhere but they say 'no blacks.' It makes me*

9

10   *sick to know we refuse to service a particular ethnicity of people. We literally go out of our way to*

11   *single them out."*

12        31.    Within the December 7, 2015 text communication in which Plaintiff resigned from her

13   position, she sought her due and owing commission. However, Defendant did not provide Plaintiff's

14   commission nor did it provide an explanation for failure to pay the due and owing commission.

15

16        32.    Though Defendant confirmed receipt of Plaintiff's text message and generated

17   separation documentation for Plaintiff acknowledging the December 7, 2015 text message, Defendant

18   did not acknowledge Plaintiff's claims of discrimination in the termination paperwork. Defendant did,

19   however, maintain a copy of said text message in Plaintiff's personnel file.

20        33.    As a direct result of Defendant EMPLOYER's wrongful conduct, Plaintiff suffered

21   significant distress and financial hardship.

22

23

24

25

26   ///

27

28

9

Complaint for Damages; Demand for Jury Trial

### FIRST CAUSE OF ACTION
**Wrongful Constructive Termination in Violation of Public Policy**
*Against Defendant*

34.    Plaintiff incorporates and alleges by reference all previous paragraphs of this Complaint as if fully set forth herein.

35.    At all times mentioned herein, California Government Code Sections 12900 and 12945, et seq., as well as their interpretive regulations, and the Constitution of the State of California, Article I, Sections 1 and 8, were in full force and effect and set forth the policy of the State of California. The public policy of the State of California as expressed therein is, in part, to protect and safeguard the right and opportunity of persons, such as Plaintiff, to seek and hold employment without discrimination, harassment and retaliation based on national origin and religion.  That public policy is also to protect persons from retaliation for complaining of discrimination, harassment and retaliation, as well as of the failure to properly remedy, prevent and investigate such discrimination, harassment and retaliation, such as Plaintiff experienced and alleged herein during employment and upon forced termination.

36.    At all times mentioned herein, the Unruh Civil Rights Act (California Civil Code Section 51) which provides protection from discrimination, harassment and retaliation by all business establishments in California *inter alia* on the bases of national origin and religion, was in full force and effect and set forth the policy of the State of California. The public policy expressed therein is, in part, to protect and safeguard the right and opportunity of persons to access services without discrimination, harassment and retaliation based on national origin and religion.

37.    Plaintiff is informed and believes Defendant, by taking the actions set forth above, wrongfully constructively terminated Plaintiff's employment in violation of the public policy of the State of California as set forth herein including but not limited to violation of California Labor Code

10

Section 201 et seq. for failure to pay due and owing wages including bonus monies due during employment and upon forced termination.

38.     Plaintiff is informed and believes Defendant, by taking the actions set forth above, wrongfully constructively terminated Plaintiff's employment  in violation of the public policy of the State of California as set forth herein including but not limited to violations of California Labor Code Section 1102.5, which was designed to protect an employee from retaliation for blowing the whistle on illegal activity including but not limited to interference with Plaintiff blowing the whistle on illegal activity.

39.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of Defendant who were acting at all times relevant to this Complaint within the scope and course of their employment. Defendant is therefore liable for the conduct of said agents and employees under the doctrine of strict liability.

40.     Plaintiff is informed and believes Defendant wrongfully terminated Plaintiff with the intention of injuring Plaintiff maliciously, fraudulently, and oppressively in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

41.     As a direct, foreseeable and proximate result of Defendant's wrongful termination of Plaintiff, Plaintiff has suffered and continues to suffer grievous and extensive damages, entitling Plaintiff to recover the following damages in amounts according to proof at trial:

        a.   lost past and future wages as well as other compensation;

        b.   lost past and future benefits including, but not limited to, lost vacation, lost bonuses, lost sick leave, lost medical benefits, and other like employee benefits;

11

1

2

      c.  past and continuing emotional distress, mental anguish, pain and suffering, humiliation, and enjoyment of life; and,

3

      d.  punitive damages.

4

5

6

7

### SECOND CAUSE OF ACTION
### Wrongful Demotion in Violation of Public Policy
*Against Defendant*

8

9

42.    Plaintiff incorporates and alleges by reference all previous paragraphs of this Complaint as if fully set forth herein.

10

11

12

13

14

15

16

17

18

19

43.    At all times mentioned herein, California Government Code Sections 12900 and 12945, et seq., as well as their interpretive regulations, and the Constitution of the State of California, Article I, Sections 1 and 8, were in full force and effect and set forth the policy of the State of California. The public policy of the State of California is, in part, to protect and safeguard the right and opportunity of persons, such as Plaintiff, to seek and hold employment without discrimination, harassment and retaliation based on national origin and religion, as well as complaining of discrimination, harassment and retaliation based on race, national origin and religion as well as due to failure to properly remedy, prevent and investigate discrimination, harassment and retaliation as Plaintiff experienced and alleged herein upon Plaintiff's wrongful demotion.

20

21

22

23

24

25

44.    Plaintiff is informed and believes Defendant, by taking the actions as set forth above, wrongfully demoted Plaintiff during her employment in violation of the public policy of the State of California as set forth herein including but not limited to violations of California Labor Code Section 1102.5, which was designed to protect an employee from retaliation for blowing the whistle on illegal activity including but not limited to interference with Plaintiff blowing the whistle on illegal activity.

26

27

28

**Complaint for Damages; Demand for Jury Trial**

45.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of Defendant who were acting at all times relevant to this Complaint within the scope and course of their employment. Defendant is therefore liable for the conduct of said agents and employees under the doctrine of strict liability.

46.     Plaintiff is informed and believes Defendant wrongfully demoted Plaintiff with the intention of injuring Plaintiff maliciously, fraudulently, and oppressively in conscious disregard of Plaintiff's rights, ultimately wrongfully terminating Plaintiff's employment. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

47.     As a direct, foreseeable and proximate result of Defendant's wrongful demotion of Plaintiff, Plaintiff has suffered and continues to suffer grievous and extensive damages, entitling Plaintiff to recover the following damages in amounts according to proof at trial:

      a.     lost past and future wages as well as other compensation;

      b.     lost past and future benefits including, but not limited to, lost vacation, lost bonuses, lost sick leave, lost medical benefits, and other like employee benefits;

      c.     past and continuing emotional distress, mental anguish, pain and suffering, humiliation, and enjoyment of life; and,

      d.     punitive damages.

## THIRD CAUSE OF ACTION
**Failure to Pay Earned Wages in Violation of California Labor Code § 201 et seq.**
*Against Defendant*

48.     Plaintiff incorporates and alleges by reference all previous paragraphs of this Complaint as if fully set forth herein.

Complaint for Damages; Demand for Jury Trial

49.     Plaintiff is due certain wages from Defendant pursuant to the terms of employment, including regular compensation, bonus and/or commission, all of which Defendant has knowingly and maliciously refused to pay to Plaintiff, and which are due and owing at this time.

50.     The unlawful conduct alleged above was engaged in by the officers, directors, supervisors and/or managing agents of Defendant, who were acting at all times relevant to this Complaint within the scope and course of their employment.  Defendants are therefore liable for the conduct of said agents and employees under the doctrine of strict liability.

51.     Under California Labor Code Sections 201 and 203, Plaintiff is entitled to 30 days continued wages as a penalty for willful failure to pay wages when due, in an amount according to proof.

52.     As a direct, foreseeable and proximate result of the acts of Defendant, as alleged herein, Plaintiff has suffered and continues to suffer grievous and extensive damages, entitling Plaintiff to recover the following damages in amounts according to proof at trial:

    a.  Plaintiff's due and owing wages including but not limited to wages for regular wages, bonus and/or commissions;

    b.  under California Labor Code Sections 201 and 203, 30 days continued wages as a penalty for willful failure to pay wages when due;

    c.  under California Labor Code Sections 201 and 203, interest on all said monies due and owing to date; and

    d.  reasonable attorneys' fees and costs incurred by Plaintiff herein, pursuant to California Labor Code Section 218.5.

///

1
2

### FOURTH CAUSE OF ACTION
**Retaliation in Violation of Labor Code § 1102.5**
*Against Defendant*

3    53.    Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as
4    if fully set forth herein.

5    54.    California Labor Code Section 1102.5(b) makes it unlawful for an employer to make,
6    adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to
7    a government or law enforcement agency, where the employee has reasonable cause to believe that the
8    information discloses a violation of state or federal statute, or a violation or noncompliance with a state
9    or federal rule or regulation.
10

11   55.    Further, California Labor Code Section 1102.5(b) prohibits an employer from
12   retaliating against an employee for disclosing information to a government or law enforcement agency,
13   where the employee has reasonable cause to believe that the information discloses a violation of state
14   or federal statute, or a violation or noncompliance with a state or federal rule or regulation. Thus,
15   retaliation in an anticipation of a complaint is considered prohibited activity as well.

16   56.    Here, Plaintiff questioned Defendant's discriminatory practices to several managers and
17
18   peers at Defendant, resulting in Plaintiff's wrongful retaliatory demotion and denial of compensation
19   ultimately resulting in her wrongful constructive termination designed to interfere with a forthcoming
20   complaint.

21   57.    The unlawful conduct alleged above was engaged in by the officers, directors,
22   supervisors and/or managing agents of Defendant, who were acting at all times relevant to this
23   Complaint within the scope and course of their employment. Defendant is therefore liable for the
24   conduct of said agents and employees under the doctrine of strict liability.
25

26

27                                    15
28

58.     Plaintiff is informed and believes Defendant retaliated against Plaintiff in anticipation of wrongfully terminating Plaintiff with the intention of injuring Plaintiff maliciously, fraudulently, and oppressively in conscious disregard to Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from Defendant in an amount according to proof.

59.     As a direct and proximate result of Defendant's and actions of managing agents as alleged herein, Plaintiff has suffered and continues to suffer grievous and extensive damages, entitling Plaintiff to recover the following damages in amounts according to proof at trial:

      a.     lost past and future wages;

      b.     lost benefits, lost business opportunities, and lost employment and advancement opportunities, both past and future.

      c.     past and continuing emotional distress, mental anguish, pain and suffering, humiliation, and enjoyment of life; and,

      d.     For reasonable attorneys' fees and costs incurred by Plaintiff herein.

## FIFTH CAUSE OF ACTION
### Negligent Supervision
*Against Defendant*

60.     Plaintiff hereby incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

61.     Plaintiff is informed and believes and thereon alleges that Defendant and their managing agents' actions against Plaintiff were consistent with a pattern of national origin discrimination, retaliation, wage and hour violations including failure to make payment of wages, and failure to prevent and remedy said conduct, in which Defendant and their managing agents had engaged against Plaintiff as alleged herein.

62.     The unlawful conduct alleged above was engaged in by Defendant as well as the managing agents of Defendant including officers, directors and supervisors were acting at all times relevant to this Complaint within the scope and course of their employment. Defendant and their managing agents are therefore liable for the conduct of said agents and employees under the doctrine of strict liability.

63.     Defendant and their managing agents knew, or in the exercise of reasonable diligence should have known, that their managing agents had a propensity for retaliation due to complaints of discrimination, harassment, retaliation, wage and hour violation and failure to prevent and remedy illegal conduct and if placed in a position in which Plaintiff directly or indirectly reported to them, would engage in a same or similar pattern against Plaintiff.

64.     Plaintiff is informed and believes, and thereon alleges, that Defendant and their managing agents failed to adequately instruct their managing agents regarding the importance of refraining from discrimination, harassment and retaliation; properly reporting discrimination and retaliation in the workplace; attempting to prevent discrimination and retaliation in the workplace; and failed to adequately supervise and/or discipline others as they also engaged in a pattern of said conduct with regards to Plaintiff. Defendant and their managing agents also ratified its employees conduct toward Plaintiff, including but not limited to through Plaintiff's retaliation for complaints among other conduct alleged herein.

65.     Plaintiff is informed and believes, and thereon alleges, that Defendant and their managing agents intended to injure Plaintiff maliciously, fraudulently, and oppressively in conscious disregard to Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from Defendant and their managing agents in an amount according to proof.

Complaint for Damages; Demand for Jury Trial

66.     As a direct, foreseeable and proximate result of Defendant and their managing agent's negligent supervision, Plaintiff has suffered and continues to suffer grievous and extensive damages, entitling Plaintiff to recover the following damages in amounts according to proof at trial.

    a.  lost past and future wages;

    b.  lost benefits, lost business opportunities, and lost employment and advancement opportunities, both past and future;

    c.  past and continuing emotional distress, mental anguish, pain and suffering, humiliation, and enjoyment of life; and,

    d.  punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment in her favor and against Defendants FIDELITY HOME ENERGY, INC. and DOES 1-50, for all claims for relief as follows:

1.     That process be issued and served as provided by law, requiring Defendants to appear and answer or face judgment;

2.     That this Court order Defendants to make, in good faith, an offer of employment to Plaintiff in a position with like seniority, status, pay and benefits as Plaintiff would have enjoyed but for Defendants' wrongful conduct;

3.     That Plaintiff have and recover a judgment against Defendants in an amount to be determined at trial as special, actual, and/or nominal damages for their wrongful conduct including but not limited to back and front pay, lost back and future benefits;

Complaint for Damages; Demand for Jury Trial

4.     That Plaintiff have and recover a judgment against Defendants in an amount to be determined at trial as general damages caused to Plaintiff including but not limited to past and continuing emotional distress, mental anguish, pain and suffering, humiliation, and enjoyment of life;

5.     That Plaintiff have and recover a judgment against Defendants for punitive damages in an amount to be determined at trial sufficient to punish, penalize and/or deter Defendants;

6.     That Plaintiff have and recover a judgment against Defendants in an amount to be determined at trial for failure to properly and timely pay Plaintiff due and owing wages, including bonus and/or commission, regularly wages, penalties and interest, pursuant to California Labor Code Section 201;

7.     That Plaintiff have and recover a judgment against Defendants in an amount to be determined at trial for expenses of this litigation, including, but not limited to, reasonable attorneys' fees and costs;

8.     That Plaintiff have and recover all reasonable costs, expenses, and expert witness fees;

9.     That Plaintiff have and recover a judgment against Defendants for all prejudgment and post-judgment interest; and,

10.    That Plaintiff have such other relief as this Court deems just and appropriate.

DATED: December 4, 2017

MORA EMPLOYMENT LAW,
A Professional Corporation

LEGAL AID AT WORK

By: _____

BETH W. MORA
Attorneys for Plaintiff AYESHA FAIZ

19

Complaint for Damages; Demand for Jury Trial

1

## JURY DEMAND

2

Plaintiff hereby demands a jury in the entitled action.

3

DATED: December 4, 2017

4

MORA EMPLOYMENT LAW,
A Professional Corporation

5

6

LEGAL AID AT WORK

7

8

By: _____

9

BETH W. MORA
Attorneys for Plaintiff AYESHA FAIZ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

20

28